**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

DIANA Y. MARTÍ NOVOA

Plaintiff,

v.

LUIS FORTUÑO BURSET, et al.,

Defendants.

CIVIL NO.: 09-1355 (JAG)

## REPORT AND RECOMMENDATION

### I.    PROCEDURAL HISTORY

On September 15, 2009, plaintiff Diana Martí Novoa ("plaintiff" or "Martí") filed an amended complaint pursuant to 42 U.S.C. § 1983, alleging that she was terminated from her employment with the Metropolitan Bus Authority ("MBA") due to political discrimination and without a pre-termination hearing in violation of her rights under the First Amendment to the United States Constitution and under the Due Process and Equal Protection clauses of the Fourteenth Amendment.  Dkt. No. 106.  She also brings various claims under the laws and Constitution of Puerto Rico.  The complaint names as defendants the following persons or entities: MBA; Santos Delgado Marrero, the former president of the MBA ("Delgado"); Gladys Fuentes Cruz, the MBA director of human resources ("Fuentes"); the Municipality of San Juan (the "Municipality"); Jorge Santini Padilla, the Mayor of San Juan; Miriam Hellman, the Director of Human Resources of the Municipality ("Hellman"); Luis Fortuño Burset, the Governor of Puerto Rico, and various members of his administration; the union that represents MBA employees; the Hermandad de Empleados de Oficina y Ramas Anexas (the "union"); and

its president, Cristino López Hance ("López").   Dkt No. 106.[1]   All defendants, with the exception of the MBA, the Municipality, and the union, are sued in their official and personal capacities.

Subsequently, all defendants filed respective motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Dkt. Nos. 107, 118, 120, 127.  The court granted the motions filed by Governor Fortuño and the members of his administration, as well as the one filed by López and the union, dismissing all claims against those parties, and granted in part and denied in part the motions filed by the remaining defendants.  Dkt. No. 190.  The motions filed by the MBA, Delgado, and Fuentes, were granted with respect to the equal protection claim and denied as to the due process claim and the political discrimination claim.  Id.  Said defendants now move for summary judgment.

Pending adjudication are two motions for summary judgment, one filed by the MBA, Fuentes, and Delgado's successor, Mike O'Neill, in their official capacities, Dkt. Nos. 208 and 209, and one filed by Delgado and Fuentes in their personal capacities, Dkt. No. 218.  Plaintiff has filed responses in opposition to both motions, Dkt. Nos. 288, 289, 292, and 293, and the official capacity defendants have filed a reply, Dkt. No. 301.[2]

---

[1] Delgado was the President of the MBA at the time the events alleged in the complaint took place.  According to the MBA defendants' motion for summary judgment, Delgado was succeeded by O'Neill subsequent to the filing of plaintiff's complaint.  Dkt. No. 208.  Additionally, Herdman is identified as "Miriam Hellman" in the complaint, but her motion for summary judgment and the transcripts of her deposition identify her as "Miriam Herdman."

[2] In her responses in opposition to each of the instant motions, plaintiff includes a list of 169 additional proposed facts, which are identical in both submissions.  Dkt. Nos. 288, 292.  Because the personal capacity defendants have not filed a reply, all such facts that are properly supported by a record citation have been deemed admitted.  See L. Cv. R. 56(e) (D.P.R. 2010) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted.").  For ease of reference, plaintiff's additional proposed facts, which are listed with the same paragraph numbers in each opposition at Docket Nos. 288 and 292, are identified as "Pl.'s ¶ [number]."

## II.  Summary of Uncontested Material Facts

The record contains evidence of the following facts, which are undisputed except where stated:

Plaintiff began her career as an employee of the Municipality of San Juan in the 1990s, where she held a career position.  Dkt. Nos. 209, ¶ 1; 292 ¶, 1; 218, ¶ 1; 288 ¶ 1.[3]  On January 16, 2001, she was appointed to a trust position at the Governor's Office ("La Fortaleza").  Dkt. Nos. 209, ¶ 1; 292, ¶ 1; 218, ¶ 2; 288, ¶ 2.  On August 11, 2008, plaintiff was transferred to the MBA and appointed to another trust position there, as a Special Assistant to the MBA president. Dkt. No. 209, ¶ 3; 292, ¶ 3; 218, ¶ 4; 288, ¶ 4.  In November of 2008, general elections were held in Puerto Rico and the New Progressive Party ("NPP") won control of the Commonwealth's government.  Plaintiff is a member of the opposing political party, the Popular Democratic Party ("PDP"), Dkt. No. 218, ¶ 8; 288, ¶ 8; Pl.'s ¶ 161, which had been in power in Puerto Rico since 2001.  In December of 2008, plaintiff requested to be reinstated to a career position.  Dkt. No. 209, ¶ 5; 292, ¶ 5; 218, ¶ 5; 288, ¶ 5; Pl.'s ¶ 5.  At that point, José Santiago ("Santiago"), a Human Resources Specialist at the MBA who is also a PDP member, reviewed plaintiff's personnel file to determine the career position for which she qualified.  Dkt. Nos. 209, ¶¶ 18-19, 27; 292, ¶ 18-19, 27; 218 ¶¶ 22-25; 288, ¶¶ 22-35.  He evaluated her experience and educational background and concluded that she was qualified for the position of purchasing agent.  Dkt. Nos. 209, ¶ 20; 292, ¶ 20; 218, ¶ 24; 288, ¶ 24.  Carlos Cortés Díaz ("Cortés"), who was then the president of the MBA, approved plaintiff's request and notified her that effective December 16, 2008, she would be reinstated to a career position as a purchasing agent in the MBA.  Pl.'s ¶¶ 6-

---

[3] In the public sector of Puerto Rico, there are two categories of public employees: career employees, who may be removed only for cause, and confidential or "trust" employees, who can be selected and removed at will.  See 3 L.P.R.A. § 1465.  Confidential employees are those that "substantially intervene or collaborate in the formulation of public policy, or those who directly advise or render direct services to the head of the agency."  Id.

7, Dkt. Nos. 209 ¶ 4, 292 ¶ 4, 218 ¶ 5, 288 ¶ 5.  Cortés, who is also a PDP member, informed

plaintiff that the purchasing agent position was a unionized position.  Dkt. Nos. 218 ¶ 9, 288 ¶ 9.

On December 17, 2008, however, plaintiff was temporarily reassigned back to a trust position, in

the Office of Management and Budget, to work on a special work assignment for the office of

the outgoing Governor, Aníbal Acevedo Vilá, and at former Governor Acevedo's request.  Dkt.

Nos. 209, ¶ 5; 292, ¶ 5; 218, ¶ 10; 288, ¶ 10.   On January 23, 2009, plaintiff's temporary

assignment concluded and she was sent back to her career position at the MBA.  Dkt. Nos. 209, ¶

6; 292, Pl.'s ¶ 13.

On February 2, 2009, López, the union president, sent a letter to Delgado, the president of

the MBA at that time, stating that plaintiff had not complied with Article V of the collective

bargaining agreement ("CBA") between the MBA and the union, and that the union was thus

requesting that plaintiff be terminated.  Dkt. Nos. 208-7; 287-38, p. 70; 209, ¶ 34; 21, ¶ 32.

Article V creates a "closed shop" for MBA employees within certain designated employee

classifications.  Dkt. No. 208-1, p. 5.[4]  It states the following with respect to employees in those

classifications:

> Within a term of ten (10) days, counted starting from the date on which the
> employee receives an appointment corresponding to the Appropriate Unit, he or
> she has a condition to continue employment, maintaining status as a bona fide
> member and being current in the payment of dues, as provided for in Article
> XVII.  It being provided that upon the conclusion of the aforementioned ten-day
> term the employee will automatically be terminated if he or she does not comply
> with this Article's provisions.

Dkt. No. 208-1, p. 5.  On February 5, 2009, López also filed a complaint with the union's

Grievances and Complaints Committee, stating that plaintiff's appointment to the purchasing

---

[4] The CBA indicates that the closed shop applies to the employee classifications "included in Article II of the
Acknowledgement," but Article II is not included anywhere in the summary judgment record.  Dkt. No. 208-1.
However, plaintiff does not dispute that her purchasing agent position was covered by the closed shop clause of the
CBA.

4

agent position had violated Articles V and VI of the CBA.  Dkt. No. 287-38, pp. 39-40; 232-2;P

Pl.'s 88.[5]  Plaintiff did not receive a copy or any notice of this grievance.  Pl.'s ¶ 90.  The

standard practice following the submission of such a grievance is that the committee summons

the individual with a letter for a given date.[6]  Dkt. No. 287-38, p. 70, ll. 10-20; Pl.'s 91.  López

did not receive a response to his complaint about plaintiff from the committee.  Pl.'s ¶ 92.

When Delgado received the letter from López, he met with a human resources employee

named Judy Morales, with Fuentes, and with the MBA's general counsel to discuss what course

of action to take with respect to the requested termination.  Dkt. No. 287-23, pp. 34, 37, 52-53.

They concluded that the CBA mandated plaintiff's termination, but Fuentes suggested trying to

have plaintiff reinstated at the Municipality of San Juan, where she had worked until 2001.  Dkt.

No. 287-23, pp. 53-54.   Fuentes then spoke with a human resources employee at the

Municipality who agreed to reinstate plaintiff.  Pl.'s ¶ 141.  Delgado told Fuentes to go ahead

with the process of reinstating plaintiff at the Municipality.  Dkt. No. 287-23, pp. 54-55.

On February 26, 2009, Delgado drafted a letter to plaintiff stating that she would be

terminated on March 2, 2009 because of her failure to join the union and pay dues as per Article

V of the CBA.  Dkt. Nos. 287-15; 287-23, p. 58, ll. 10-13; Pl.'s 139.  The letter also instructed

plaintiff to reinstate herself at the Municipality. Dkt. Nos. 287-15; 287-23, p. 58, ll. 10-13.  Also

on said date, Delgado replied to López's letter informing him that the MBA had proceeded to

terminate plaintiff from her purchasing agent position.  Dkt. Nos. 287-38, p. 71; 287-41.

Plaintiff received Delgado's letter on February 27, 2009.  Dkt. Nos. 209, ¶ 32; 292, ¶ 32;

218, ¶ 31; 288, ¶ 31.  That same day, plaintiff met with Delgado, Fuentes, and Morales in

---

[5] Article VI provides that vacant and newly created positions covered by the CBA shall be filled by a competitive
process, whereby interested candidates submit their applications for consideration to the MBA office of human
resources. Dkt. No. 227-6.
[6] López's testimony does not make clear whether the individual who is summoned is the person who filed the
complaint or who is the subject of the complaint.  Dkt. No. 287-38, p. 70, l. 16.

Delgado's office to discuss the termination letter.  Pl.'s ¶ 28.  Plaintiff explained that she did not know it was her responsibility to take action to join the union and pay dues.  Dkt. No. 287-17. She said that no one from human resources or the union had advised her how to proceed and that López, the union president, would not receive her.  Dkt. No. 287-17.  Delgado responded that the union had requested plaintiff's termination and that he had to abide by that request.  Dkt. No. 287-17.

Subsequently, plaintiff went to the Municipality, but was informed that she could not be reinstated there.  Pl.'s ¶ 40.  She met with Miriam Herdman, the Municipality's Human Resources Director, who told her that once an employee is transferred out of the Municipality, any reinstatement to which that employee might be entitled must occur at the place where the employee is currently working.  Dkt. No. 287-25, p. 32, ll. 21-25, p. 33, ll. 1-2.  Subsequently, Herdman wrote a letter to Delgado stating that his request to have plaintiff reinstated at the Municipality could not be granted.  Pl.'s ¶ 43; Dkt. No. 287-28.  She cited a section of the Puerto Rico Autonomous Municipalities law which provides that a trust employee who was formerly a career employee has a right to reinstatement to a career position upon separation from the trust position, and that such reinstatement "shall preferably take place in the same body where [the employee] served prior to leaving the confidential service."  21 L.P.R.A. § 4559.

On March 3, 2009, and again on March 9, 2009, plaintiff wrote to Delgado detailing the reasons that she believed her termination was wrongful and that the Municipality had refused to reinstate her.  Pl.'s ¶¶ 42, 46.  She also indicated that Herdman had informed her that it was the MBA, not the Municipality that had the obligation to reinstate her.  Dkt. No. 287-28.  The letter also states that plaintiff is completely willing to join the union and to pay any union dues that she owes retroactively.  Dkt No. 287-28.  Delgado answered these letters on March 18, 2009, stating

that plaintiff's termination was justified because she had the obligation to join the union and pay dues, she had been briefed about this obligation, and she had not fulfilled it.  Pl.'s 46; Dkt. No. 287-29.   He concluded that her termination was final and he would not reconsider it.   Id. Delgado is a member of the NPP.  Pl.'s ¶ 160; Dkt. No. 301, ¶ 160.  Delgado understood that plaintiff was a PDP member because she had worked with former Governor Acevedo.  Pl.'s ¶ 161; Dkt. No. 301, ¶ 161.  Fuentes also knew that plaintiff had held a trust position with the former governor.  Pl.'s ¶ 136; Dkt. No. 301, ¶ 136.

## III.    Standard of Review

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992).  Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[7]  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant presents a properly focused motion "averring an absence of evidence to support the

---

[7] Rule 56 was amended effective December 1, 2010, after the present suit was filed.  However, "[t]he substantive standard for summary judgment remains unchanged."  Tropigas De P.R. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 n.5 (1st Cir. 2011).  Therefore, since the application of the amended rule to the present case would be "feasible" and would not work an "injustice," Rule 56, as amended, shall govern the determination of the parties' motions.  Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 777 n.4 (1st Cir. 2011) (citing 28 U.S.C. § 2074(a)).

nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug., Inc., 895 F.2d 46, 48 (1st Cir. 1990). For issues where the nonmoving party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts" in the record "that demonstrate the existence of an authentic dispute." McCarthy 56 F.3d at 315. The plaintiff need not, however, "rely on *uncontradicted* evidence . . . . So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (citations omitted). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## IV.    Analysis

Defendants move for summary judgment on both of plaintiff's remaining claims: (1) that she did not receive due process prior to her termination, in violation of the Due Process clause of the Fourteenth Amendment, and (2) that her termination was due to her political affiliation, in

violation of the First Amendment.   With respect to the first claim, defendants argue that plaintiff's reinstatement to her career position was void, and she thus had no protected property interest in that position.   Regarding the second claim, defendants contend that they had a legitimate, non-discriminatory reason for terminating plaintiff, namely, the non-payment of her union dues.   The personal capacity defendants also claim that they are entitled to qualified immunity as to both of plaintiff's claims.   Each of these arguments will be addressed in turn.

### A.  Procedural Due Process Claim

The Due Process clause of the Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law."   It is well-established that public employees have a property interest in their continued employment only if "existing rules or understandings" that "stem from an independent source such as state law" create a reasonable expectation that employment will continue.   Dávila Alemán v. Feliciano Melecio, 992 F. Supp. 91, 96 (D.P.R. 1997) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); citing Bishop v. Wood, 426 U.S. 341 (1976)). Under Puerto Rico law, public employees that are categorized as "career" or "regular" employees have a property interest in their employment.   See 3 L.P.R.A. § 1465 ("Career employees . . . are entitled to remain in the service pursuant to the provisions of § 1462e of this title."); § 1462e(4) ("The appointing authority may only . . . remove any career employee for just cause, after having given written notice of the bringing of charges and . . . his/her right to request a hearing before action is taken."); Kercado Meléndez v. Aponte Roque, 829 F.2d 255, 262 (1st Cir. 1987) (construing predecessor statute and holding that Puerto Rico law clearly gives career employees a property interest in their employment).   On the other hand, employees classified as

"confidential" or "trust" employees do not have a constitutionally protected property interest in their positions and can be freely removed.  Galloza v. Foy, 389 F.3d 26 (1st Cir. 2004).

The validity of a state public employee's appointment must be determined by reference to applicable local law; in this case, the intersection between the Commonwealth Public Service Human Resources Administration laws, 3 L.P.R.A. §§ 1461-68p, (formerly the Personnel Act), the Metropolitan Bus Authority Act, 23 L.P.R.A. §§ 601-20, and the MBA's own personnel regulations.  Defendants argue that plaintiff's reinstatement to a career position from a trust position in December of 2008 violated a section of the Commonwealth public service law known as the electoral ban or moratorium, which prohibits making any changes to employees' status during the two months preceding and following the holding of the General Elections in Puerto Rico.  3 L.P.R.A. § 1462h.  Specifically, the law voids "any personnel transaction which include the essential areas of the merit principle, such as appointments, promotions, demotions, or transfers . . . changes or . . . compensation actions or changes of job category."  Id.[8]  Defendants thus claim that plaintiff's change in category was void because it took place in the month following the November 2008 General Election.  Plaintiff contends that reinstatements from trust to career positions are not covered by this prohibition.

As an initial matter, the electoral ban applies to the MBA.  The MBA is a public corporation that, "for constitutional purposes, operate[s] as a private enterprise or business," 23 L.P.R.A. § 602, and is therefore expressly excluded from the provisions of the Commonwealth public service human resources laws.  See 3 L.P.R.A. § 1461e(3).  However, said laws mandate public corporations to "adopt personnel regulations that incorporate the merit principle within the

---

[8] The merit principle is contained in the Commonwealth Public Service Human Resources Law and ensures that personnel transactions such as selection, training, promotion, and retention are based on employee merit and skill and without discrimination for various impermissible reasons, including race, sex, religion or  political beliefs.  3 L.P.R.A. § 1451a.

administration of their human resources, pursuant to the provisions of this chapter."  3 L.P.R.A. § 1461e.  Moreover, "when an excluded agency's own regulations 'do not comply with the fundamental purpose of guaranteeing strict application of the merit principle . . . the provisions of the [Personnel] Act . . . shall be applied."  Estrada Adorno v. González, 861 F.2d 304, 306 (1st Cir. 1988) (citing Torres Ponce v. Jiménez, 113 P.R.R. 58, 70-71 (1982)) (alterations in original).  The Supreme Court of Puerto Rico has declared that the electoral prohibition is the "safeguard par excellence of the merit principle governing the public service."  Ortiz v. Mayor of Aguadilla, 107 D.P.R. 819, 824 7 P.R. Offic. Trans. 890 (1978); see also Reyes Coreano v. Executive Director of the P.R. Ports Authority, 110 D.P.R. 40, 10 P.R. Offic. Trans. 51 (1980) ("[T]he [pre- and post-electoral] prohibition . . . was established, precisely, to guaranty the faithful application of the merit principle in the public service.").   Therefore, the electoral ban must apply to the MBA, even if its regulations do not expressly reference it.[9]

Additionally, although the First Circuit has never explicitly held that a reinstatement from a trust to a career position violates the electoral ban, the language of the statute and Puerto Rico Supreme Court precedent indicate that it does.[10]  In Colón Santiago v. Rosario, 438 F.3d 101 (1st Cir. 2006), the plaintiffs were employees of the Puerto Rico Power Authority ("PREPA"), who

---

[9] The complete MBA regulations are not before the court, as the parties have submitted only limited excerpts for the summary judgment record.   None of those excerpts include a section that reflects the electoral ban found at 3 L.P.R.A. §1462h.

[10] Neither party has cited any case law to support their respective positions on whether the electoral ban applies to reinstatements.  Plaintiff cites several Puerto Rico Court of Appeals cases regarding the right to reinstatement, but none have official English translations and plaintiff has not provided translations.  Dkt. No. 293, pp. 37-38.  Similarly, the MBA defendants cite a Puerto Rico Court of Appeals case holding that a trust employee's reinstatement to a career position was voided by the electoral ban, but also have not provided a certified translation and there is no official translation.  Dkt. No. 208, p. 23 (citing Silén Beltrán v. Depto. de Estado, Case No. RPE-01-12-669, 2005 WL 190052 (TCA Jan. 11, 2005)).  Although decisions of intermediate state courts should guide a federal court where there is no other binding precedent, see Fidelity Union Trust Co. v. Field, 311 U.S. 176, 177-78 (1940), any decision upon which a party relies that is not written in English must be accompanied by an English translation.  Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008).  Accordingly, the court cannot consider the un-translated, Spanish-language cases upon which the parties have based the aforementioned arguments.

had been reinstated from trust to career positions during the electoral ban time period. Upon reinstatement, they retained the same salaries they had received as trust employees, which were higher than the salaries of employees in comparable career positions. When the new administration came into power and plaintiffs' salaries were reduced, they argued that they had been deprived of a property interest without due process of law. In its defense, PREPA argued that plaintiffs' reinstatements were void because they had occurred during the electoral ban. Id. at 109. The court, however, did not reach this question because it found that the reinstatements to lower positions with higher salaries constituted de facto promotions, and it was "undisputed that promotions are prohibited by the ban." Id. The court then emphasized that it was "in no way expressing any opinion as to whether a reinstatement in general during the electoral ban is per se invalid." Id. The First Circuit has not subsequently had occasion to address this question.

The ban, by its terms, however, prohibits "changes in category." It is clear from other provisions of the Puerto Rico public service laws that the word "category" refers to the distinction between trust and career positions. The subchapter addressing the relationship between trust and career positions is entitled "employee categories," 3 L.P.R.A. §§ 1465-1465c, and the subsection entitled "change of service and category" discusses the procedure for moving from a trust to a career position and vice versa. 3 L.P.R.A. § 1465c. Additionally, the subsection entitled "job classification" references job characteristics other than the trust and career distinction. 3 L.P.R.A. § 1462a. Therefore, the text of the public service laws indicate that moving from a trust to career position is a "change in category" of the type referred to in the electoral moratorium.

Moreover, the ban is not limited to the listed personnel transactions, but rather covers "*any* personnel transaction which includes the essential areas of the merit principle, *such as*

appointments, promotions, demotions, or transfers . . . changes or . . . compensation actions or changes of job category." 3 L.P.R.A. § 1462h (emphasis added). This inclusive language, coupled with the ban's importance to preserving the merit principle, has led the Puerto Rico Supreme Court to apply it broadly. See, e.g., Zambrana Torres v. González, 145 D.P.R. 616, 199 P.R. Eng. 854, 541 (1998) (holding that approval of employee's completion of a probationary period that occurred within two months of election violated electoral ban, upon certification of question from the U.S. District Court for the District of Puerto Rico) (plurality opinion) (Negrón García, J., concurring); Zambrana Torres v. González, 71 F. Supp. 2d 14, 20 (D.P.R. 1999) (agreeing with Justice Negrón García's concurrence and adopting it as opinion of the court). Additionally, the Puerto Rico Supreme Court noted that all of the listed transactions have in common, in addition to being essential to the merit principle, that they "could be used as a reward or a punishment for politico-partisan acts and beliefs." Id. at 631 (Corrada del Río, J., concurring). A reinstatement from a trust to a career position fits within this category. While trust positions are often higher in an agency hierarchy, because they are occupied by employees who are involved in policy-making or work directly with agency heads, career employees have the advantage of lifetime tenure with removal only for good cause. Therefore, reinstatement to a career position might conceivably be used as an attempt by an outgoing political party "to embed permanently its employees . . . by reclassifying positions," Sánchez López v. Fuentes Pujols, 375 F.3d 121, 129 (1st Cir. 2004), thereby constituting a reward for employees loyal to that party. Accordingly, reinstatement from a trust to a career position is the type of personnel transaction that is prohibited by the electoral ban.

Plaintiff's reinstatement from her trust position with the MBA to a career position in the MBA was void because it occurred on December 16, 2008, less than two months after the 2008

13

General Election.[11]  See 3 L.P.R.A. § 1462h ("Failure to comply with this measure shall entail the voiding of the transaction thus carried out.").  Voiding this appointment leaves plaintiff in her previous trust position in the MBA.  It is undisputed that plaintiff did not have a constitutionally-protected property interest in that position, as trust employees are of free selection and removal under Puerto Rico law.  Galloza, 389 F.3d 26 (1st Cir. 2004).

Nevertheless, as plaintiff correctly points out, she was a trust employee who had formerly been a career employee.  This gave her the right to reinstatement in a career position upon separation from her trust position.  Plaintiff is mistaken, however, in asserting that the Municipality was obliged to reinstate her, as that responsibility lay with the MBA, according to its own regulations.  Specifically, the MBA's regulations provide that:

> When a regular employee in a career position, either at the Authority or transferred from another Agency, public instrumentality, or Municipality, comes to hold a position of trust and is subsequently removed from the position of trust held, he will be entitled to reinstatement *at the Authority* in the same position or a position similar to that which he held in the career service before entering the position of trust.

MBA Personnel Regulations § 13.2(b), at Dkt. No. 227-4 (emphasis added).  Because plaintiff was removed from her trust position at the MBA, and had previously been an employee in a career position at the Municipality, the regulation entitles her to be reinstated in a career position at the MBA, but not at the Municipality.[12]  The First Circuit Court of Appeals has held that this

---

[11] The MBA defendants also argue that plaintiff's appointment was void because it did not comply with Article VI of the collective bargaining agreement, which requires vacant positions to be opened to competition, Dkt. No. 227-6, as plaintiff was reinstated automatically without applying for the position in competition with other applicants. Defendants, however, do not explain how or why this provision applies to a trust employee who, like plaintiff, had a right to reinstatement in a career position, and the cited section of the agreement does not make clear whether it applies only to new hires but also to reinstatements.  Moreover, as discussed below, even if plaintiff's appointment were void for this reason, she would still have a right to reinstatement to a different career position.

[12] Plaintiff mentions a similar provision of the Autonomous Municipalities Law, which states that a trust employee who was formerly a career employee is entitled to be reinstated as a career employee.  The applicable law here is the MBA regulation, as plaintiff was employed there at the time she was terminated; however, even if the Autonomous Municipalities Law applied, the result would be the same.  That section provides that the trust employee's "reinstatement shall preferably take place in the same body where he/she served prior to leaving the confidential service."  21 L.P.R.A. § 4559.  Here, that body is, of course, the MBA.  Incidentally, this is the same provision of

reinstatement right constitutes a property interest in continued public employment.   See Gaztambide Barbosa v. Torres Gaztambide, 902 F.2d 112 (1st Cir. 1990) (denying qualified immunity to defendants who summarily dismissed trust employee who had reinstatement right under agency's regulations).   In Gaztambide, the plaintiff was a trust employee at the Puerto Rico Housing and Urban Development Corporation ("HUDC"), who had previously been a career employee at the Puerto Rico Office of Youth Affairs.   Id. at 113.   The HUDC is a public corporation that had a regulation with similar language and the same substance as the above-cited MBA regulation.   Accordingly, the court held that the plaintiff had a clearly established property interest in being reinstated in a career position with the HUDC upon being terminated from his trust position with that agency.   Id. at 115.   In so holding, the court clarified that reinstatement under this rule was not akin to a new hire, but was instead a form of continued employment with the agency.   Id. at 115-16 ("The refusal to find plaintiff a different position within the same agency amounted, functionally, to a dismissal from the agency.").   Therefore, the right to reinstatement is a property interest that merits due process protections.   See id. at 114; Gaztambide Barbosa v. Torres Gaztambide, 776 F. Supp. 52, 60 (D.P.R. 1991) (holding, upon remand, that defendants violated due process rights of plaintiff entitled to reinstatement by dismissing him without any written explanation or pre-termination hearing).   Plaintiff too, then, had a property interest in her continued employment with the MBA by virtue of her right to reinstatement in a career position at the MBA that was the same or similar to the career position she had previously held with the Municipality.[13]

_____

law that Herdman cited in her letter to Delgado explaining that the Municipality could not reinstate plaintiff.  Dkt. No. 271-18.

[13] Although the circumstances of this case implicitly require a public corporation to keep a trust employee in her current position until the expiration of an electoral ban (absent extraordinary situations such as, for instance, commission of a crime by the employee in a position of trust in which case said employee's right to reinstatement could also be affected), the burden placed on the entity's management is outweighed by the public interest in

Defendants' final argument is that plaintiff's appointment to the purchasing agent career position violated Article VI, which states that vacant positions covered by the CBA will be filled by candidates who applied through a competitive process.   It is undisputed that plaintiff's appointment to the purchasing agent position did not follow this procedure.   Therefore, defendants argue that said appointment was invalid because it violated the CBA.  They further argue that this provision of the CBA nullifies plaintiff's right to reinstatement as per Section 13.2(b) of the MBA Personnel Regulations because those regulations provide that if any of their provisions conflicts with an applicable collective bargaining agreement, the latter will prevail. Dkt. No. 208, p. 26; MBA Personnel Reg. Art. 4(b), at Dkt. No. 227-5.   Both of these contentions are unavailing.

First of all, there is a genuine dispute as to whether Article VI applies to appointments of employees who have a right to reinstatement to a career position as per Section 13.2(b) of the personnel regulations.   Article VI does not expressly state that it applies to reinstated employees. It is not clear whether there may be a different section of the CBA that specifically applies to the procedure for reinstatements because the complete CBA is not in the summary judgment record. Moreover, the testimony of José Santiago, the MBA human resources employee who processed plaintiff's reinstatement, indicates that reinstatements do not need to follow the process described in Article VI.   When asked how vacant union positions at the MBA are filled, he answered that "it's done by means of job announcements, but in this case, since [plaintiff] was a trust employee, the decision is made by the president and vice president of the area, of Human Resources."  Dkt. No. 208-4, p. 64, ll. 14-19.

---

ensuring that the merit principle is preserved during the sixty days subsequent to an election for purposes of reinstatements to career positions.

Finally, Article VI does not conflict with the right to reinstatement contained in the MBA Personnel Regulations.  First, as already discussed, it is not clear that Article VI necessarily applies to reinstatements from trust to career positions.  Further, even if it did, defendants have not shown that a trust employee cannot be reinstated in a career position that is not covered by the CBA.  The CBA states that it applies only to the classifications of employees listed in "Article II of the acknowledgment."  Dkt. No. 208-1.  Because the parties have presented only selected portions of the CBA, Article II is not in the summary judgment record.  Defendants, as the parties moving for summary judgment, have the burden to set forth evidence to showing that all career positions are covered by the CBA, so as to support their argument that reinstatements to career positions conflict with the competition requirements of the CBA's Article VII.  Without such evidence, Article VI of the CBA is not per se inconsistent with Section 13.2(b) of the personnel regulations, and Article VI thus does not affect plaintiff's right to reinstatement to a career position in the MBA.

Therefore, contrary to defendants' arguments, plaintiff did have a property interest in continued employment with the MBA, and she was thus entitled to procedural due process before being terminated.  Defendants do not make any arguments as to whether plaintiff in fact received sufficient due process.  Accordingly, it is recommended that their motions for summary judgment be denied as to plaintiff's due process claim.

### B.  Political Discrimination Claim

The First Amendment's protection of the freedom of association prohibits government officials from taking adverse employment action against non-policymaking public employees due to the employee's political affiliation.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976); Welch v. Ciampa, 542 F. 3d 927, 938 (1st Cir. 2008); see also Rodríguez Marín v. Rivera

González, 438 F.3d 72, 75 (1st Cir. 2006) (collecting cases).  The Supreme Court has set out a tripartite burden shifting test in cases of political discrimination.  Cruz-Baez, et. al. v. Negrón-Irizarry, et. al., 360 F. Supp. 2d 326, 339 (D.P.R. 2005) (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  The plaintiff bears the initial burden to establish a prima facie case of political discrimination by showing that political affiliation was the motivating factor for the adverse employment action.  Id.  Then, the burden shifts to the defendant to show, by a preponderance of the evidence, that the decision to take the action "would have been made regardless of the employee's political affiliation," commonly known as the "Mt. Healthy defense."  Id.  Finally, if the defendant's proffered reason is "credible and nondiscriminatory," then the burden shifts back to the plaintiff to show that such reason is merely pretextual and that "political affiliation was '*more likely than not* a motivating factor.'" Id. (quoting Padilla-García v. Rodríguez, 212 F.3d 69, 74 (1st Cir. 2000)) (emphasis in original). In order to establish the prima facie case, the plaintiff must adduce evidence that:  "(1) the plaintiff and defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's  . . . affiliations; (3) . . . a challenged employment action [occurred]; and (4)  . . . political affiliation was a substantial or motivating factor behind it."  Welch, 542 F.3d at 938-39 (quoting Martínez Vélez v. Rey Hernández, 506 F.3d 32, 39 (1st Cir. 2007)) (alterations and omissions in original).  Defendants briefly contend that plaintiff has not established a prima facie case, but focus most of their argument on their proffered Mt. Healthy defense.

### 1.  Prima Facie Case

The parties do not dispute that plaintiff is a member of the PDP and that Delgado is a member of the opposing NPP.  Further, defendants admitted that that Delgado knew that plaintiff was a member of the PDP, and that this knowledge was based on her work with the former

governor.  Fuentes, on the other hand, refused to disclose her political affiliation in both her deposition and her answers to interrogatories because, she stated, she believed that disclosure of this information could have an impact on her career as a public employee.  See Pl.'s ¶ 169; Dkt. Nos. 301, ¶ 169; 287-22, p. 147; 287-19, p. 12.  Because different inferences could be drawn from this, Fuentes's political affiliation remains a disputed issue of fact.  However, plaintiff has not presented sufficient evidence to show that Fuentes knew of her political affiliation, nor have defendants admitted this fact.  Plaintiff argues that she is an active member of the PDP who does not hide her political affiliation and that she held several trust positions with PDP administrations; however, such evidence is insufficient to conclude that Fuentes knew that she was a PDP member.  See González Di Blasini v. Family Dep't, 377 F.3d 81, 85-86 (1st Cir. 2004) (holding that the fact that plaintiff was a well-known party supporter and had held previous trust positions insufficient to show that defendants knew about her political affiliation and demoted her for that reason); Marrero Saez v. Municipality of Aibonito, 756 F. Supp. 2d 215, 223 (D.P.R. 2010) (citations omitted) ("[T]he fact that a plaintiff is a well-known supporter of that party, . . . held trust positions when that party was in power, or suffered an adverse employment action shortly after a change in administration, are insufficient to show that defendants must have been aware of his political affiliation."); Febus Rodríguez v. Questell Alvarado, 660 F. Supp. 2d 157 (D.P.R. 2009) (finding the fact that plaintiffs participated as election officials and attended PDP political rallies insufficient to show the defendants knew of their affiliation); Díaz Ortiz v. Díaz Rivera, 611 F. Supp. 2d 134, 144 (D.P.R. 2009) (citations omitted) (granting summary judgment because "none of the plaintiffs, except [a specified few] offer[ed] evidence that [defendant] had first-hand knowledge of their affiliations" with the opposing party).  Therefore, plaintiff cannot establish a prima facie case as to Fuentes.

As to the remaining defendants, Delgado and the MBA, the only question is whether plaintiff can establish a causal connection between Delgado's knowledge of her political affiliation and his decision to terminate her.[14]   Although plaintiff's evidence is thin and circumstantial, it is sufficient to survive summary judgment.  See Mulero Rodríguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and emphasizing that "determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury"); Kercado Meléndez v. Aponte Roque, 829 F.2d 255 (1st Cir. 1987) (holding that circumstantial evidence alone is enough to establish a causal connection if it would allow a reasonable factfinder to believe that political affiliation was a substantial or motivating factor for the adverse employment action).

As discussed more thoroughly below, see infra Part IV.B.2, plaintiff has presented evidence that calls into question whether the proffered reason for her termination—the failure to pay union dues—was a pretext, rather than a neutral and nondiscriminatory employment action. Evidence of pretext can be used to support the third prong of plaintiff's prima facie case as well as her rebuttal of defendants' Mt. Healthy defense.  See Rivera v. Galarza, Civil No. 04-1144 (DRD), 2005 WL 1641955, at *6 (D.P.R. Jul. 12, 2005) (unreported) (citing McDonell Douglas Corp. v. Green, 411 U.S. 792 (1973)) (finding evidence that defendants' reason for termination is a sham "may be considered probative of discriminatory animus."); see also Acevedo Díaz v. Aponte, 1 F.3d 62, 68 (1st Cir. 1993) ("[T]o the extent the reasons given by the employer at the

---

[14] The official capacity defendants point out that a municipality or public corporation can only be held liable under Section 1983 if the conduct complained of was the result of an official policy or custom.  Dkt. No. 208, p. 5.  It is well-settled that the actions of municipal or corporate officials with final decision-making authority constitute official policy for purposes of Section 1983.  See, e.g., Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).  As Delgado was the president and general manager of the MBA at the time of plaintiff's termination, there can be no doubt that he had "final decision-making authority."  Additionally, he was directly involved in plaintiff's alleged injury because he made the ultimate decision to terminate her.  See Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (holding that a plaintiff must show a "direct causal link between the municipal action and the deprivation of federal rights").  Therefore, if Delgado is liable to plaintiff under Section 1983, the MBA will also be liable.

time of the dismissal are later proven false or frivolous, the weight of the evidence of discriminatory animus may be enhanced, thereby contributing significantly to the threshold.").

Similarly, defendants' shifting justifications for plaintiff's termination is also circumstantial evidence of discriminatory animus.  Although Delgado told plaintiff that she was being terminated solely for her failure to pay union dues, defendants later indicated that there were other reasons for their actions.   Specifically, in their instant motions, they also argue that her reinstatement was void because it violated Article VI of the CBA and the electoral ban.  Additionally, Fuentes testified that the nonpayment of dues was the "main reason" for plaintiff's termination but that the electoral ban and alleged Article VI violation were "also in the case, however, they [were] secondary."   Dkt. No. 287-42, p. 10, ll. 22-24.   Inconsistencies in an employer's justification for an adverse employment action may be evidence of discriminatory animus.  See Straughn v. Delta Air Lines, 250 F.3d 23, 42 (1st Cir 2000) (quoting Santiago Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000)) (in Title VII employment discrimination context).

Furthermore, plaintiff has pointed to several ways in which the MBA's and the union's standard procedures were not followed in effecting her termination.  First, Delgado directed her to seek reinstatement with the Municipality, even though the MBA's own regulations clearly state that she had a right to reinstatement in the MBA.  Also, defendants abandoned any effort to reinstate plaintiff after the Municipality refused to re-hire her.  This shows that defendants either did not understand that plaintiff had a right to reinstatement as per the MBA Personnel Regulations, or that they deliberately decided to ignore that regulation.  As agency heads are presumed to know the content of their own regulations, the latter inference is plausible.  Moreover, plaintiff was not told of any right to appeal the decision to terminate her, even though

Article V of the CBA indicates that terminations for a failure to pay union dues may be appealed before the Labor Relations Board.[15]

Additionally, according to plaintiff's testimony, she did not receive the proper information about how to join the union and pay dues, which could be attributable to defendants. Although defendants have contested this, the issue remains disputed for summary judgment purposes. The parties also dispute the extent to which plaintiff made a good faith effort to join the union. If she in fact did so, then defendants' failure to allow her to cure any errors made during her attempts to affiliate could also be evidence of discriminatory animus.

Citing to her deposition testimony, plaintiff contends that, although she knew her position was unionized when she was hired, she was not aware of the requirement to affiliate within ten days of appointment until February 5, 2009, after the ten days had already elapsed. Dkt. No. 287-32, pp. 158-59 (plaintiff's deposition). She also maintains that she was not informed of the correct steps that she needed to take to join the union. Prior to February 5, 2009, she thought that affiliating to the union was an automatic process that would be completed by human resources or the union itself. Pl.'s ¶¶ 56-60; Dkt. No. 287-16, pp. 71, 74, 77.[16] She stated that no one from human resources or the union had explained the process to her. Pl.'s ¶¶ 56-60; Dkt. No. 287-16, pp. 71, 74, 77. After the end of her first fifteen-day pay period, she realized that she was not a union member when she noticed that the dues were not being deducted from her paycheck. Dkt. No. 287-32, p. 219. After that, she went to the human resources office many times to ask when they would begin deducting the dues. Dkt. No. 287-32, p. 220. She maintains that every time

---

[15] It states, in pertinent part, that whenever "an employee is severed in this way and reinstated pursuant to a Labor Relations Board Order, the Brotherhood will reimburse the Authority for any late sum in wages which the Authority is obligated to pay to the employee." Dkt. No. 208-1.

[16] Additionally, Cartagena testified that, as far as she could recall, the usual and customary procedure at the time she worked at the MBA was that the union would contact the newly-appointed employee about union benefits and send the employee the relevant documents to be completed. Dkt. No. 287-33, p. 58, ll. 3-25, p. 60, ll. 13-20.

she would go to the human resources office, Santiago, the employee who handled her reinstatement, told her that they were waiting for the union to send the necessary documents for her affiliation.  Pl.'s ¶ 51, Dkt. No. 287-16, p. 67, ll. 14-23.  She further maintains that on February 5, 2009, Santiago told her to talk with an employee named Arlene Santodomingo ("Santodomingo") to do the paperwork for her union affiliation.  She states that she did so and, at this time, learned for the first time that she should have joined the union within ten days of her appointment.  Dkt. No. 287-32, pp. 158-59.  Plaintiff affirms that she did not fill out any paperwork that day, but that Santodomingo told her that she had to communicate with the president of the union in order to affiliate.  Dkt. No. 287-32, p. 16, ll. 10-12.  According to plaintiff, she did attempt to call the union president, but the record does not indicate the results of this attempt.  Dkt. No. 287-32, p. 160, ll. 2-5.[17]

Defendants counter that plaintiff knew or should have known that the CBA required union affiliation within ten days of appointment and, further, that Santiago informed plaintiff of the proper process for affiliation.  Specifically, defendants argue that plaintiff had notice of the contents of the CBA back when she began working in her trust position at the MBA in August of 2008.  Dkt. Nos. 218, ¶¶ 18-21; 209 ¶¶ 7-15.  Pointing to the deposition of Ivette Cartagena Rivera ("Cartagena"), who was the MBA vice-president of human resources until December 29, 2008, and who processed plaintiff's appointment to her trust position as Special Assistant to the MBA president, Dkt. No. 287-33, defendants maintain that it was that a "common practice" of the Human Resources Department to give incoming special assistants a copy of the MBA's

---

[17] In plaintiff's deposition transcript, which she cites to support her assertion that Santodomingo told her to communicate with the union president in order to affiliate, she states "I called the Union president.  I tried to meet with him . . . ," Dkt. No. 287-32, p. 160, ll. 2-3 (ellipsis in original), but defense counsel then begins a different line of questioning, and the cited portion of the transcript does not indicate anything further about these communication attempts.  At the meeting that plaintiff attended with Delgado and Fuentes prior to her termination, however, she states that the union president would not receive her, without referring to a specific date or time, Dkt. No. 287.  It is not clear whether this was a reference to the same communication attempt.

collective bargaining agreements, among other documents.  Dkt. Nos. 209, ¶ 15; 208-2, p. 35, ll. 17-22.  Cartagena also stated that when plaintiff was appointed, she prepared an envelope of documents for her.  Dkt. Nos. 209, ¶ 10; 208-2, p. 35, ll. 12-15, p. 36, ll. 9-14.  At the deposition, defense counsel showed Cartagena a document that she identified as a checklist from human resources, listing the documents that were placed in the envelope.  Dkt. No. 208-2, p. 34, ll. 10-25.  She stated that any document with a check mark next to it was in the envelope that plaintiff received.  Dkt. No. 208-2, p. 39, ll. 4-6.  The official capacity defendants submitted the checklist as an exhibit to their motion for summary judgment, and the items entitled "HEO collective bargaining agreement" and "TUAMA collective bargaining agreement" have check marks next to them.  Dkt. Nos. 208-3; 218-15, 227-1.[18]  Plaintiff, however, has produced a document that is identical, except that there are no check marks beside the listed collective bargaining agreements.  Dkt. No. 287-35.  Plaintiff testified that she obtained this document prior to the events giving rise to this litigation, when she had requested a copy of her personnel file from the MBA.  Dkt. No. 287-16, p. 86.  Therefore, it remains contested whether plaintiff actually received a copy of the CBA when she was appointed to her trust position with the MBA.

Defendants also offer Santiago's deposition testimony to dispute plaintiff's claim that no one informed plaintiff what steps she needed to take to join the union until February of 2009.  Santiago recounted several occasions between January 4, 2009 and January 10, 2009, when plaintiff came to the human resources office to seek information about her health insurance.  Dkt. No. 209, ¶ 21; 208-4, pp. 35-36; 68.  According to Santiago, plaintiff told him that she had noticed that the union dues were not being deducted from her paycheck, so Santiago instructed her to go the office of an employee named Arlene Santodomingo ("Santodomingo") to do the

---

[18] "HEO" is the abbreviation for the union that plaintiff was supposed to join, the Hermandad de Empleados de Oficina y Ramas Anexas.

paperwork for her union affiliation.  Dkt. No. 208-4, p. 36, ll. 13-17.  He also told her to bring a check to Santodomingo to pay for the dues that had not been deducted thus far.  Dkt. No. 209, ¶ 25; 208-4, p. 68, ll. 18-25; p. 69, ll. 1-19.  Defendants emphasize that plaintiff acknowledged she did not fill out any paperwork that day, Dkt. No. 287-32, p. 16, ll. 10-12, although plaintiff maintains that Santodomingo did not ask her fill out paperwork but only to call the union president, which she maintains she did.

Because of this conflicting testimony, the extent of plaintiff's knowledge about the steps she needed to take to join the union, and when she became aware of this obligation, remain contested factual issues.  The outcome of these issues may impugn defendants' purported good faith motive for plaintiff's termination.  Defendants emphasize that the PDP, plaintiff's own political party, was in power at the time she was appointed and should allegedly have been briefed about her union obligations.  On the other hand, it is undisputed that the NPP, Delgado's party, was in power when Delgado decided to terminate plaintiff.  The evidence, viewed in the light most favorable to plaintiff, indicates that her failure to join the union was not intentional, but due to misunderstanding and lack of information.  Further, plaintiff explained to Delgado her attempts to join the union and offered to pay dues retroactively (both at the meeting and in her two letters to him); however, he gave her no opportunity to remedy the situation, but instead terminated her without attempting to reinstate her at the MBA.  Defendants have not presented any evidence showing that the MBA had a practice of strictly enforcing Article V of the CBA without regard to any extenuating circumstances.  In the absence of such evidence, plaintiff's punishment appears rather drastic in proportion to her CBA violation.  This raises suspicion about the genuine motive for her termination.  Other inferences could be drawn from defendants' behavior, but at the summary judgment stage, such inference must be drawn in plaintiff's favor.

Therefore, although plaintiff has not presented direct evidence that her termination was motivated by her affiliation to the PDP, she has presented enough circumstantial evidence to seriously call into question the legitimacy of her termination—both the reasons given for it and the way in which it was effected.  While recognizing that this showing is minimal, it is well-settled that "courts should exercise particular caution before granting summary judgment for employers on issues such as pretext, motive, and intent." Santiago Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)).  Accordingly, for summary judgment purposes, plaintiff has established a prima facie case against Delgado and the MBA.

### 2. Defendant's Mt. Healthy Defense

To successfully establish their Mt. Healthy defense, Delgado must show that he would have taken the same adverse employment action against plaintiff regardless of her political affiliation.  See Costa Ureña v. Segarra, 590 F.3d 18, 26 (1st Cir. 2009).  In other words, he must show that he would have fired her, without reinstating her, due to her failure to join the union and pay dues.  It is undisputed that plaintiff did not, in fact, join the union or pay dues and that this was clearly grounds for termination as per Article V of the CBA.  It is also undisputed that the union itself requested that plaintiff be terminated for her noncompliance.  To carry his burden, however, Delgado must do more: to show that he would have taken this action anyway; he must show that the MBA has "a practice of taking corrective action against all employees in such positions." Sánchez López v. Fuentes Pujols, 375 F.3d 121, 131 (1st Cir. 2004).  That is to say, "in order to defeat the plaintiffs' prima facie case, a defendant must not only prove a neutral basis for the adverse employment action, but also that such basis is uniformly applied." Sueiro Vázquez v. Torregrosa de la Rosa, 380 F. Supp. 2d 63, 72 (D.P.R. 2005) (García-Gregory, J.)

(citing <u>Acevedo García v. Vera Monroig</u>, 204 F.3d 1, 10-11 (1st Cir. 2000) (where defendants did not prevail because otherwise lawful layoff plan was applied in a discriminatory manner)); <u>see</u> <u>Sánchez López v. Fuentes Pujols</u>, 375 F.3d 121, 132 (1st Cir. 2004) (holding that "simply showing that an appointment was illegal under local law [did] not suffice to meet defendants' <u>Mt. Healthy</u> burden"; rather, defendants had to show "a consistently applied practice of remedying all such illegal appointments"); <u>Padilla García v. Guillermo Rodríguez</u>, 212 F.3d 69, 77-78 (1st Cir. 2000) (finding that court could not determine whether restructuring plan may have been used as "a discriminatory tool" where the record did not show that other employee besides plaintiff were also terminated under the plan).

Here, defendants have not proffered any evidence to meet this burden.  They have not shown that it is a common practice to terminate employees for failure to join the union or pay dues, nor that any other employee has ever been terminated this way.  In fact, in their answers to interrogatories, defendants state that "this is the first case in which the Union and the MBA have to apply Article V of the Collective Bargaining Agreement," in response to a question as to how many employees had ever been terminated under Article V.  Dkt. No. 287-19, p. 12.  Two inferences can be drawn from this: 1) that no employee has ever violated Article V, or 2) that other employees that have violated Article V were not terminated on this basis.  Because plaintiff is the non-moving party, the latter inference must be drawn in her favor at the summary judgment phase.[19]  Therefore, in addition to the above-mentioned variations in defendants' proffered justification for plaintiff's termination, Delgado and the MBA have not conclusively established that they "would have taken the challenged employment action anyway," as <u>Mt.</u>

---

[19]  In that answer, defendants also say that that "this was also the first time in which a vacant union position is filled out to reinstate an employee to her career position, in violation of the collective bargaining agreement."  However, whether or not plaintiff's reinstatement violated Article VI of the CBA is a question of the interpretation of the CBA, about which defendants are not necessarily correct, as previously discussed.  Moreover, whether the manner of plaintiff's reinstatement violated the CBA is relevant to Article VI, not Article V, of the CBA.

Healthy requires.  Accordingly, it is recommended that their motion for summary judgment be denied.

### C.  Qualified Immunity

Delgado and Fuentes, in their personal capacities, argue that they are entitled to qualified immunity because plaintiff has failed to show that her constitutional rights were violated. Because this argument rests on an assumption that is unsupported by the summary judgment record, it is unavailing.  A state official is entitled to qualified immunity when a plaintiff has shown that a constitutional right was violated, but the court determines that the right was not clearly established and that a reasonable officer could have believed that the conduct in question was lawful.  See Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223, 236-37 (2009).  The two elements of the qualified immunity defense are usually analyzed sequentially: first, the court determines if a constitutional right was violated; second, it evaluates whether that right was clearly established at the time of the violation and was one that a reasonable officer should know.  Id.; Pearson, 555 U.S. at 236-38.

Delgado and Fuentes make no arguments beyond the first step of the qualified immunity analysis.  They first assert that even if the court "were to find that Plaintiff's rights have been violated . . . they are entitled to the qualified immunity defense."  Dkt. No. 219, p. 18. Puzzlingly, however, they reason that they are entitled to such defense because plaintiff "failed to establish the violation of his [sic] constitutional rights by the appearing defendants."  Id. at p. 19.  They claim that they acted in accordance with the provisions of the CBA, and therefore did not violate any laws.  To the contrary, whether defendants' actions were justified by the CBA and whether they violated plaintiff's First and Fourteenth Amendment rights are contested issues

that should be determined by a jury.  See supra Part IV.A-B.[20]  Consequently, defendants are not entitled to qualified immunity on the basis that they have asserted.

Furthermore, defendants' failure to advance any argumentation with respect to step two of the analysis further warrants a denial of their qualified immunity request.  Just as a plaintiff fending off dismissal has an "affirmative responsibility to put his best foot forward in an effort to present some legal theory that will support his claim," McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 23 (1st Cir. 1991), so does a defendant have a responsibility to develop arguments in favor of dismissing the claims against him.  See also id. at 22 (noting that "[o]verburdened trial judges cannot be expected to be mind readers" and "a plaintiff cannot expect the district court to do his homework for him"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); Rivera Gómez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) ("[A] litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.") (citation omitted). Accordingly, it is recommended that Fuentes and Delgado's request for qualified immunity be denied.

### V. CONCLUSION

Based on the foregoing analysis, it is hereby recommended that the motions for summary judgment filed by the MBA, Fuentes, and Delgado's successor, Mike O'Neill, in their official capacities, Dkt. No. 208, and by Delgado and Fuentes in their personal capacities, Dkt. No. 218, be granted in part and denied in part.  Specifically, it is recommended that:

- The motion for summary judgment at Docket No. 208 be:

---

[20] The only exception here is plaintiff's First Amendment claim against Fuentes.  Having found that plaintiff cannot establish a prima facie case of political discrimination against Fuentes, and that said claim should thus be dismissed, the issue of qualified immunity is moot as to that alleged constitutional violation.

- o GRANTED in favor of Fuentes in her official capacity as to the First Amendment claim only; and

- o DENIED as to the First Amendment claims against the MBA and O'Neill in his official capacity; and

- o DENIED as to the Due Process claims against all defendants; and that

- The motion for summary judgment at Docket No. 218 be:

  - o GRANTED in favor of Fuentes in her personal capacity as to the First Amendment claim; and

  - o DENIED as to the First Amendment claim against Delgado; and

  - o DENIED as to the Due Process claims against Delgado and Fuentes.

The parties have fourteen (14) business days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B), and Local Civil Rule 72(d); see also 28 U.S.C. § 636(b)(1); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 13th day of August, 2012.

s/Marcos E. López
U.S. Magistrate Judge